IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ATLANTIC MUTUAL INSURANCE COMPANY<br>100 WALL STREET<br>NEW YORK, NY  10005<br><br>v.<br><br>KATHLEEN GULA AND HER HUSBAND,<br>PAUL GULA<br>824 GROVE AVENUE<br>SPRINGFIELD, PA 19064 | :<br>:<br>:<br>:<br>: CIVIL ACTION NO.<br>:<br>:<br>:<br>:<br>:<br>: |

**MEMORANDUM OF LAW
IN SUPPORT MOTION FOR JUDGMENT ON THE PLEADINGS
OF ATLANTIC MUTUAL INSURANCE COMPANY**

COMES NOW plaintiff, Atlantic Mutual Insurance Company ("Atlantic Mutual"), by and through its attorneys, Marshall, Dennehey, Warner, Coleman and Goggin, and files this Complaint for Declaratory Judgment and would show the Court the following:  No coverage exists for duty to defend nor for duty to indemnify because the allegations in the underlying Complaint do not trigger the Atlantic Mutual commercial general liability policy issued to TMCA/Novaeon Inc., ("Novaeon").

**I.  FACTS**

Kathleen and Paul Gula have filed two tort suits for personal injuries which are pending in Delaware County, Pennsylvania.  One suit named Novaeon as a defendant on a theory of liability that it failed to perform its obligations to Kathleen Gula such that she was unable to obtain adequate, timely and proper health care.  In essence, that suit alleges a medical-malpractice type of liability based on conscious decisions of how and what business procedures

would be implemented by Novaeon.[1]  Novaeon was insured by the plaintiff in this case, Atlantic Mutual. The insurance policy in question bears policy  No. 432 30-16-79 and was in full force and effect during the relevant time period.  A copy of the policy is attached hereto as Exhibit "A."

Defendants also filed a second tort suit against a number of health care providers and doctors in Delaware County (i.e., Gula, et al. v. Ken Wynne, P.A. et al.) alleging medical negligence and damages sustained by Kathleen Gula as a result of an at work accident just as in the Novaeon suit.  Atlantic Mutual did not insure any defendant in the Wynne matter.  On information and belief, Movant would show that Mrs. Gula had made at least some recovery from the workers' compensation insurer for her injury.  Additionally, Mrs. Gula also has the prospect of additional recovery via the Wynne suit.

The insured, Novaeon filed for relief pursuant to the U.S. Bankruptcy Code in an action captioned In re: Novaeon, Inc., No. 00-18821 (BIF) in the Bankruptcy Court for the Eastern District of Pennsylvania.  Defendants, Kathleen Gula and her husband, Paul Gula, then obtained a stipulation for relief from the automatic stay in order to seek recovery for personal injuries and derivative claims (the subject of their Complaint) but limited to the liability insurance indemnification amounts applicable to their claims.  A copy of the stipulation which is dated January 17, 2001, is attached hereto marked Exhibit "C."  The bankruptcy has either been brought to a conclusion or will be shortly.  Since the stipulation for relief from the automatic stay immunized Novaeon from any liability, Novaeon has no interest in the instant declaratory judgment suit.

Thereafter, on or about January 30, 2001, defendants, Kathleen Gula and her husband, Paul Gula, instituted a lawsuit in the Court of Common Pleas of Delaware County, PA, captioned

---

[1] See, Gula Complaint, p. 5; Exhibit "B."

<u>Kathleen Gula and her husband, Paul Gula, v. TMCA/Novaeon, Inc.</u>, Case No. 01-2011 (C.P. Del. Cty. 2001) ("the underlying action").  A copy of the Complaint in the underlying action is attached hereto as Exhibit "B."  The insured, Novaeon, Inc., never gave notice of the Gula's Complaint to plaintiff, Atlantic Mutual.

Plaintiff learned of the Complaint in January 2002 when it received a letter from Attorney C. George Milner who wrote that he represented Kathleen Gula and Paul Gula in the underlying action.  In a letter dated February 1, 2002, attorney Milner was informed by plaintiff, Atlantic Mutual, that it had determined there was no coverage afforded this matter under the policy and that it respectfully declined to participate in the defense of the underlying <u>Gula v. Novaeon</u> case.

Defendants have apparently obtained a default judgment in the underlying action on or about April 15, 2002, although it does not appear from the records available to plaintiff that Rule 237.1 of the Pa. Rules of Civil Procedure was followed which requires that a written notice of the intention to file a Praecipe for entry of judgment by default be mailed or delivered at least ten (10) days prior to the date of the filing of the Praecipe *to the party against whom judgment is to be entered and to the party's attorney of record, if any*.  (Emphasis supplied).  In this case, the notice of intent to file the Praecipe for the entry of default judgment was not served on Novaeon, the party against whom the judgment was to be entered, nor was there any attorney of record in that case.  Accordingly, the default judgment would appear to be improperly obtained based upon the face of the record known to plaintiff at this time.  In any event, the viability of the default judgment is irrelevant to the disposition of this motion for judgment on the pleadings.

The operative facts of Defendant's claim against TMCA/Novaeon as they appear on the face of the Complaint are as follows:

> 3. Kathleen Gula fell while she was setting up diagnostic equipment during the course of her employment as

3

an x-ray technician at Taylor Hospital. The fall occurred on January 10, 1999.

  6. Kathleen Gula visited her family physician who told her that her problems were the result of her fall at work and she should see Park Care Health Organization for medical treatment.

  7. On February 24, 1999 Ken Wynne, Physician's Assistant, of Park Care saw her, advised that she return to work on light duty, have an MRI done, and prescribed a leg brace to support her foot and ankle.

  10. As of March 28, 1999 Kathleen Gula was advised that a pre-certification for an EMG from Novaeon, Inc. was required and she was told to call Novaeon directly to get the certification for the diagnostic procedure.

  11. On March 30, 1999 Novaeon certified Kathleen Gula for physical therapy and for an EMG which was done on April 1, 1999.

  12. Dr. Bruce Grossinger, a neurologist to whom Kathleen Gula was sent, diagnosed Kathleen Gula's left common peroneal nerve entrapment and erroneously recommended against surgery.

  14. Dissatisfied with the care she was getting, Kathleen Gula secured an appointment with Vidyar Citale, M.D., a neurosurgeon, who scheduled her for surgery to release the peroneal nerve. The surgery was performed on May 24, 1999.

  16. As a result of the missed diagnosis and needless treatment delays and diagnostic delays and administrative requirements which caused delays, plaintiff Kathleen Gula was not provided the appropriate and timely medical care.

  25. TMCA/Novaeon, Inc., is the health care management administrator or vendor to or for Kathleen Gula's employer through whom and with whose approval she is required to seek medical care and treatment.

  26. TMCA/Novaeon, Inc. failed to establish and implement reasonable processes and procedures for plaintiff to get adequate, timely and proper health care for her injury.

>    27.   As a result of TMCA/Novaeon, Inc.'s failure to perform its obligations plaintiff's opportunity for proper and timely treatment was lost and she is left with the permanent incapacities alleged hereinbefore.

(See, Exhibit "B").

Based upon the allegations appearing on the face of the Gula Complaint, Atlantic Mutual prays that this Honorable Court grant its Motion for Judgment on the Pleadings because the Defendants have not alleged a set of facts that, if subsequently proved, would trigger insurance coverage for the duty to defend or to indemnify the insured, Novaeon. Specifically, the allegations in the Gula Complaint do not allege an "occurrence" such as to trigger coverage. Additionally, the allegations state a claim for damages arising from the rendition of "professional services" which is excluded by the Atlantic Mutual policy.

**II.   STANDARD OF REVIEW**

In rendering a decision on a party's Motion for Judgment on the Pleadings, Rule 12(c) of the Federal Rules of Civil Procedure controls. Rule 12(c) states, in pertinent part:

>    After the pleadings are closed but within such time as not to delay trial, any party may move for judgment on the pleadings.

Fed. R. Civ. P. § 12(c) (2002). A motion for judgment on the pleadings is treated using the same standard as under Fed. R. Civ. P. 12(6). Turbe v. Government of Virgin Islands, 938 F.2d 427, 428 (3rd Cir. 1991). Dismissal is warranted only if it appears beyond doubt that the party asserting the claim can prove no set of facts in support of his claim which would entitled him to relief. Conley v. Gibson, 355 U.S. 41, 45-56, 2L Ed. 2d 80, 78 S. Ct. 99 (1957); Brown v. Philip Morris, Inc., 250 F.3d 789, 796 (3rd Cir. 2001).

When considering a Motion for Judgment on the Pleadings, the Court must consider as true any well-pleaded factual allegations in the pleadings, must draw any permissible inferences from those facts in the non-moving party's favor, and may grant a motion for judgment on the

pleadings only when the non-moving party has alleged no set of facts that, if subsequently proved, would entitle relief. Ohio Casualty Group of Insurance Companies v. Werley, Civ. A. No. 01-7257, 2002 U.S. Dist. LEXIS 18109 (E.D. Pa. 2002); DeBraur v. Messner, 958 F.Supp. 227, 229 (E.D. Pa. 1997) (citing, Hishon v. King & Spalding, 467 U.S. 69, 73 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984).

### III.    LEGAL ANALYSIS

The basic principles of Pennsylvania coverage law implicated by this matter have been in place for decades. One presentation of those principles as announced by the Third Circuit Court of Appeals stated the following:

> Under Pennsylvania law, an insurance company is obligated to defend an insured whenever the Complaint filed against the insured party may potentially come within the policy's coverage. Gedeon v. State Farm Mutual Automobile Insurance Co., 410 Pa. 55, 158 A.2d 320 (1963); the obligation to defend is determined solely by the allegations of the Complaint in the action. Wilson v. Maryland Casualty Company, 377 Pa. 588, 105 A.2d 304 (1954). The factual allegations of the Complaint against the insured are controlling. The duty to defend remains with the insurer until the insurer can confine the claim to a recovery that is not within the scope of the policy.

Pacific Indemnity Company v. Linn, 766 F.2d 754 (3d Cir. 1985); (string citations omitted).

The Pennsylvania articulation of the applicable law appears in the Superior Court decision in Humphreys v. Niagra Fire Insurance Company, 590 A.2d 1267 (1991) which states:

> In determining whether the insured had any potential basis for recovery under a theory of breach of duty to defend, the critical consideration is that the obligation of an insurer to defend an action is fixed solely by the allegations in the underlying Complaint. United States Auto. Assoc. v. Elitzky, 358 Pa. Super. 362, 517 A.2d 982 (Pa. Super. 1986). The obligation to defend arises whenever the underlying Complaint, in this instance the Federal Complaint, potentially may come within the coverage of the policy. State Automobile Insurance Association v. Kuhfahl, 364 Pa. Super. 230, 527 A.2d 1039 (Pa. Super. 1987).

The test to be applied in determining whether an insurer has a duty to defend its insured was summarized in D'Auria v. Zurich Insurance Company, 352 Pa. Super. 231, 507 A.2d 857 (Pa. Super. 1986) as follows:

Even though the insurance policy states that the insurer must defend against allegations which are groundless, false or fraudulent, this does not mean that the insurer has a duty to defend any suit filed against the insured. The duty to defend is limited only to those claims covered by the policy. Thus, the insurer owes a duty to defend if the Complaint against the insured alleges facts which would bring the claim within the policy coverage if they were true. It does not matter if in realty the facts are completely groundless, false or fraudulent. It is the fact of the Complaint and not the truth of the facts alleged therein which determines whether there is a duty to defend.

Humphreys, supra, 590 A.2d at 1271.

Similarly, there should be no dispute with regard to the law of Pennsylvania on the interpretation of insurance policies as stated by the Pennsylvania Supreme Court in the case of Standard Venetian Blind Company v. American Empire Insurance Company, 503 Pa. 300, 569 A.2d 563 (1983):

[t]he principles governing our interpretation of a contract of insurance are familiar and well settled. The task of interpreting a contract is generally performed by a Court rather than by a jury. The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument. Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. Where, however, the language of the contract is clear, a Court is required to give effect to that language.

Standard Venetian Blind, supra, 496 A.2d at 566, citations omitted; see also, Stump v. State Farm Automobile Insurance Company, 378 Pa. Super. 310, 564 A.2d 194 (Pa. Super. 1989).

With those basic legal principles of both coverage law and contractual interpretation in place, we now turn to the analysis of the particular issues raised in this case.

    **A.**    **The allegations in the Complaint do not state an "Occurrence" under which relief can be granted under the Atlantic Mutual policy.**

At all relevant times, the commercial insurance policy issued to Novaeon, Inc. by Plaintiff stated in Section 1, coverage A, bodily injury and property damage the following:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

At all relevant times, the insuring agreement defined "occurrence" as follows:

> "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

(A true and correct copy of the policy is attached hereto as Exhibit "A, 2").

In order for coverage to attach in the first instance, the insured's legal liability must be caused by an "occurrence." In the definition section, "occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions. Accordingly, the first inquiry to be made is whether the incident in question was an accident. The Pennsylvania Supreme Court has concluded that a claim by a restaurant patron where she was assaulted in the defendant's establishment was not an accident, and therefore was not an "occurrence" under the restaurant's liability policy.

In <u>Gene's Restaurant, Inc. v. Nationwide Insurance Company</u>, 519 Pa. 306, 548 A.2d 246 (1988), the Supreme Court affirmed the Lower Court's decision that the restaurant's liability insurer had no duty to defend the insured because the assault out of which the claim arose was not an occurrence. After quoting from precisely the same policy definition of that term as is involved in this case, the Court concluded:

> Under this definition, an `occurrence' is an accident. The willful and malicious assault alleged in the Complaint is not an accident

8

> but rather is an intentional tort. As such, it is not covered by the policy and, therefore, the insurer owed no duty to defend.

Gene's Restaurant, supra, 548 A.2d at 274. Accordingly, an "occurrence" for the purposes of Pennsylvania coverage law must fall within the definition of an accident and not an intentional act. As such, there is no ambiguity as to the definition of "occurrence."

The Pennsylvania Supreme Court in Casper v. American Guarantee & Liability Ins. Co., 408 Pa. 426, 429, 184 A.2d 247 (Pa. 1962), defined an "accident" as "an unusual or unexpected result attending the operation or performance of a usual or necessary act or event." This definition was originally articulated by our nation's Supreme Court in U.S. Mutual Accident Association v. Barry, 131 U.S. 100, 9 S.Ct. 755, 33 L. Ed. 60 (1889), where it was said that an "accident" within the meaning of an insurance policy is an event "happening by chance unexpectedly taking place not according to the usual course of things or not as expected." Under Pennsylvania law, it is clear that an accident is the antithesis of something likely to occur, foreseeable in due course. Casper, 408 Pa. at 429. If an occurrence is the ordinary and expected result of the performance of an operation, then it cannot be termed an accident. Id. To constitute an accident, the occurrence must be an "unusual or unexpected result attending the operation or performance of a usual or necessary act or event." Hey v. Guarantors' Liability Indemnity Co., 181 Pa. 220, 37 A. 402 (Pa. 1897); cited in, Casper, 408 Pa. at 429.

Decisions pertaining to the running of a business have been held to constitute an intentional act and hence not an "occurrence" for the purpose of a coverage dispute. In Casper, supra, the insured acted as a subcontractor in a store remodeling project. A merchant in the store brought a negligence action against the insured for allegedly causing "large quantities of dirt, dust, plaster, cement and other materials … to be deposited in, on and upon the plaintiff's goods, wares and merchandise." Casper, 408 Pa. at 438. The defendant, American Guarantee and

Liability Insurance Co., subsequently brought a motion for judgment on the pleadings. The plaintiff's complaint, using language similar to the Gula Complaint, stated in pertinent part:

> The negligence of the defendants and each of them consisted inter alia:
>
> (a) **In making openings** in the walls, ceilings and the work being constructed and failed to cover or otherwise protect them and the other pre-existing openings in the building such as doorways, and stairways leading to or upon the plaintiff's premises so as to cause dirt, dust and debris to be deposited through such openings upon the goods, wares and merchandise of the plaintiff.
>
> (b) **In failing to properly handle** the materials employed by defendants and each of them so as to prevent dirt, dust, and debris from being deposited on the goods, wares and merchandise, of the plaintiff.
>
> (c) **In failing to water down or moisten** the construction work in the course of demolition and/or construction so as to avoid dust, dirt and debris from being deposited on the goods, wares and merchandise of the plaintiff.

Casper, 408 Pa at 432, (emphasis added). Our Supreme Court held that the alleged acts complained of in the complaint could not be construed as alleging damages caused by accident. Rather the Court stated that the harmful conduct was "reasonably calculated to cause substantial damage of the very sort that occurred." The insured in Casper made a business-related decision to perform the job in a certain way. A result of the way that the insured chose to perform its work allegedly was "dirt, dust and debris" on plaintiff's merchandise. Thus, defendant's conscious decision of how to conduct business resulted in harm to plaintiff. Accordingly, the Casper court decided that such allegations did not constitute an "occurrence" because the insured's intentional decision as to how to perform his work was not properly classifiable as an "accident."

Similarly, the United States District Court for the Eastern District of Pennsylvania in Nationwide Property & Casualty Insurance Co. v. Feryo Hearing Aid Service, Inc., held that an employer's / insured's decision to discharge an employee could only be interpreted as an

10

intentional act, and therefore it could not be deemed an occurrence for the purposes of triggering the insurer's contractual duty to indemnify. 895 F.Supp. 85 (E.D. Pa. 1995). Moreover, breach of a business's obligation to a third party has been held to be an intentional act. <u>Redevelopment Authority of Cambria County v. International Insurance Co.</u>, 454 Pa. Super. 374, 685 A.2d 581 (Pa. Super. 1996) (failure of a township's water system to comply with environmental standards and to deliver potable water was held not to constitute an "occurrence"). The underlying Gula Complaint alleges the same type of conduct attributable to Novaeon as the basis of liability. Just as in the <u>Casper</u> case and the other two cases cited above, the decision to do business in a certain way, which allegedly results in harm, is not accidental and therefore not an "occurrence."

The underlying case, <u>Gula v. Novaeon</u>, does not allege an "occurrence" but rather the Gula Complaint alleges a conscious decision to perform work that allegedly resulted in harm to Kathleen Gula. The allegations against Novaeon in the Gula claim may have been tragic, but are by no means an accident. The Complaint states in pertinent part:

> 25. TMCA/Novaeon, Inc. is the health care management administrator or vendor to Kathleen Gula's employer through whom and with whose approval she is required to seek medical care and treatment.
>
> 26. TMCA/Novaeon, Inc. failed to establish and implement reasonable processes and procedures for plaintiff to get adequate, timely and proper health care for her injury.
>
> 27. As a result of TMCA/Novaeon, Inc.'s failure to perform its obligations plaintiff's opportunity for proper and timely treatment was lost and she is left with the permanent incapacities alleged hereinbefore.

(See, Exhibit "B").

A conscious decision to perform business in a certain way does not fall under the definition of an "accident." In their suit against Novaeon, the Gulas allege that Novaeon

11

conducted business in such a way as to delay the availability of medical treatment.[2]  Nowhere in the allegation of the Novaeon suit do the Gulas allege negligence or accidental conduct of any kind.[3]  In essence, the Gula Complaint alleges that Novaeon did not have "processes and procedures" in place so "adequate and proper healthcare" could be obtained by Kathleen Gula.  There is nothing accidental in these allegations.  The conduct in question is nothing more then Novaeon's way of doing business which represents a volitional, conscious decision on its part to do what it did.  Such conduct can only be interpreted as intentional and therefore not accidental.  Absent an "accident" there cannot be an "occurrence."  Absent an "occurrence" there can be no coverage for either the duty to defend or the duty to indemnify.

      **B.**    **The allegations in the Complaint fall within the "Professional Services" Exclusion therefore no coverage is triggered under the Atlantic Mutual policy.**

At all relevant times, the commercial insurance policy issued to Novaeon, Inc. by Plaintiff stated in Section 1, coverage A, for bodily injury the following:

    2.    Exclusions.

    This insurance does not apply to:  (j) "bodily injury"… arising out of the rendering or failure to render professional services.

(Exhibit "A. 2").  Therefore, even the insured's legal liability was caused by an "occurrence," the operative conduct in the Complaint in the underlying action will bar any duties by Atlantic Mutual to TMCA/Novaeon under the policy because the Complaint alleges that Kathleen Gula's injuries arose out of TMCA/Novaeon's rendering and failing to render professional services.

The Supreme Court of Pennsylvania defined "professional services" as:

    A "professional" act or service is one arising out of a vocation, calling, occupation or employment involving specialized knowledge, labor or skill,

---

[2] The Gulas also allege in a separate tort suit against various doctors and other healthcare providers that the same medical treatment that was allegedly delayed, injured Kathleen Gula.  Even if this motion is granted, the Gulas will still have an opportunity of redress for alleged harm against the doctors and hospitals who are defendants in the Wynne suit, which is in addition to any workers' compensation benefits already received or to be received.

[3] See, Gula Complaint, paragraphs 26, 27; Exhibit "B."

12

> and the skill involved is predominantly mental or intellectual, rather than physical or manual. . . . In determining whether a particular act is of a professional nature, or a professional service, we must look not to the title or character of the party performing the act, but to the act itself.

Physicians Insurance Co. v. Pistone, 555 Pa. 616, 716 A.2d 339 (Pa. 1999).

Similarly, the Third Circuit in Harad v. Aetna Casualty and Surety Co., stated that the definition of "professional services" was as follows:

> Something more than an act flowing from mere employment or vocation . . . the act or service must be such as exacts the use or application of special learning or attainments of some kind. The term "professional" . . . means something more than mere proficiency in the performance of a task and implies intellectual skill as contrasted with that used in an occupation for production or sale of commodities. A "professional" act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual. In determining whether a particular act is of a professional nature or a "professional service" we must look not to the title or character of the party performing the act, but to the act itself.

Harad v. Aetna Casualty & Surety Co., 839 F.2d 979 (3rd Cir. 1988) (quoted in, Bank of California, N.A. v. Opie, 663 F.2d 977, 981 (9th Cir. 1981); Curtis Ambulance v. Board of City Commissioners, 811 F.2d 1371, 1379-80 (10th Cir. 1987); Horn v. Burns & Roe, 536 F.2d 251, 255 (8th Cir. 1976).

In Horad, the Third Circuit held that because the actions of an insured fell within the definition of professional liability, Aetna was not required to defend or indemnify an insured because of the "professional services" exclusion in the Aetna policy. The facts of Horad are as follows: Aetna issued a general commercial liability policy to Charles Horad, a licensed Pennsylvania attorney, that included a "professional services" exclusion. The Aetna policy used the same language as in the Mutual Atlantic "professional services" exclusion, i.e. the policy did not apply to liability "arising out of the rendering or failure to render any professional service."

A lawsuit was filed against Harad claiming malicious prosecution.  The malicious prosecution lawsuit was based on Harad signing a verification to an answer and counterclaim, in which Horad asserted that the underlying plaintiff "conspired and/or contrived to defraud by concealing and/or misrepresenting the fact that the vehicles" were for personal rather than business use.  Aetna refused to defend Horad based on the "professional services" exclusion in the policy.  Subsequently, Harad filed a complaint against Aetna seeking a declaratory judgment that Aetna was under a duty to defend and indemnify Harad.

The Third Circuit in <u>Horad</u> reasoned that the act of drafting, signing and filing the answer and counterclaim, exposed Horad to liability and that these acts are professional in nature and go to the heart of the type of services an attorney provides to his clients.  The court states that if Harad not have been a licensed attorney, he would not have been able to file the documents thus exposing himself to liability. The Third Circuit held that Harad's liability "flowed directly from his performance of a professional activity, and as the policy excluded coverage for any liability arising from the 'rendering . . . of any professional service,' the exclusion clearly obviate[d] any duty to defend and indemnify."

The Gulas' Complaint in the underlying liability case, <u>Gula v. Novaeon</u>, essentially states a claim that Novaeon was acting as a gatekeeper with respect to the type of medical treatment Kathleen Gula would be allowed to receive.  As alleged in the underlying Complaint, Mrs. Gula was injured at work.[4]  Her employer, Taylor Hospital, apparently had workers' compensation insurance through which Novaeon was retained as a gatekeeper for the approval of medical treatment.[5]  Allegedly, Mrs. Gula was required to go through Novaeon's administrative procedures for approval of specific medical treatment.[6]  As further alleged, Novaeon's way of

---

[4] See, Gula Complaint, p. 3; Exhibit "B."
[5] See, Gula Complaint, p. 25; Exhibit "B."
[6] See, Gula Complaint, p. 10; Exhibit "B."

going business in its capacity as a gatekeeper or cost containment outfit, resulted in Mrs. Gula "not [being] provided [with] … appropriate and timely medical care."[7] Thus, it is reasonable to interpret these allegations concerning to how medical treatment is obtained and therefore such allegations assert liability by virtue of the rendition of "professional services" which are excluded under the policy.

The line of reasoning employed by the court in <u>Horad</u> is applicable in the present matter. The underlying Complaint describes the conduct of Novaeon as follows:

> 26.  TMCA/Novaeon, Inc. failed to establish and implement reasonable processes and procedures for plaintiff to get adequate, timely and proper health care for her injury.
>
> 27.  As a result of TMCA/Novaeon, Inc.'s failure to perform its obligations plaintiff's opportunity for proper and timely treatment was lost and she is left with the permanent incapacities alleged hereinbefore.

(See Exhibit "B").  Just as in <u>Horad</u>, the allegations in the Gula Complaint explicitly state that Novaeon's alleged liability is premised on its performance in determining the type and timing of Kathleen Gula's medical treatment.  Novaeon's alleged conduct as the gatekeeper of medical care for Mrs. Gula is the unambiguous equivalent of performing professional services.  Since the acts of administering health care claims are professional in nature and go to the heart of what a "health care management administrator or vendor" organization provides, the actions of Novaeon are "professional service" and thus are excluded from coverage under the terms of the Atlantic Mutual policy.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, Plaintiff, Atlantic Mutual respectfully contends that as a matter of law, Gula's claims against the insured are not covered under the latter's commercial

---

[7] See, Gula Complaint, p. 16; Exhibit "B."

general liability policy. Plaintiff now asks this Honorable Court to end the coverage dispute by enforcing the language of the contract in accordance with the controlling principles of Pennsylvania law and specifically by declaring the policy does not provide coverage either because no "occurrence" has been alleged or pursuant to the "professional services" exclusion.

                                                  Respectfully submitted,

                                                  MARSHALL, DENNEHEY, WARNER,
                                                  COLEMAN & GOGGIN

                                        By: _____
                                               William K. Conkin, Esquire
                                               Attorney for Defendant
                                               Atlantic Mutual Insurance Company

Date:_____

\01_18\LIAB\RAW\TRLD\243763\RAW\01155\00169